**Vance H. TRIMBLE, Plaintiff,**

v.

**Felton M. JOHNSTON, Secretary of the United States Senate, Robert A. Brenkworth, Financial Clerk, United States Senate,**

**and**

**Joseph C. Duke, Sergeant at Arms, United States Senate, Defendants.**

**No. 921–59.**

United States District Court
District of Columbia.

June 2, 1959.

17. Section 1(b) of Reorganization Plan No. 3, 63 Stat. 1066 (1949), 5 U.S.C.A. § 369 note.

652

Norman S. Jeavons, Cleveland, Ohio, and Mark P. Friedlander, Washington, D. C., for plaintiff.

Donald B. MacGuineas, Dept. of Justice, Washington, D. C., for defendants.

HOLTZOFF, District Judge.

This is an action brought by a newspaper correspondent against the Secretary of the United States Senate, the Financial Clerk of the Senate, and the Sergeant at Arms of the Senate, for a mandatory injunction requiring them to permit him to inspect and copy certain payroll records and other documents and papers relating to the disbursement of Government funds by the Senate of the United States. The case is before the Court on a motion by the defendants to dismiss the complaint.

In order to deal adequately with the issues raised by counsel, it is necessary for us to revert to basic tenets on which the institutions of the Federal Government are founded. Although like all fundamental principles they are familiar and well known, they are nevertheless likely to be overlooked at times in the pressure of details connected with the routine activities of life. It is wholesome to pause in order to reflect and ponder over them anew at periodic intervals and thus to refresh ourselves at the fountain of our liberties.

At the foundation of the structure of the Federal Government lies the doctrine of the separation of powers among three independent co-ordinate branches,—the legislative, the executive and judicial departments. With certain specific, express exceptions generally known as "checks and balances", each of the three departments is independent of the others. As a corollary, none of them may encroach on the powers of either of the other two.

The Federalist, one of the great sources of American political philosophy, refers to this principle as "the political maxim, that the legislative, executive, and judiciary departments ought to be separate and distinct" (No. 47). The author emphasizes the vital importance of this theory by stating that, "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." This discussion is expanded in paper No. 48 of The Federalist, as follows:

"It is agreed on all sides, that the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments. It is equally evident, that none of them ought to possess, directly or indirectly, an overruling influence over the others, in the administration of their respective powers."

The judicial branch of the Government is independent of the other two departments. Its decisions and its business may not be controlled or influenced by either the legislative or executive branch. In fact, it has been often said that there can be no liberty without an independent

judiciary. Reciprocally, the judicial branch of the Government may not control or direct the legislative or executive departments. Thus, the Federal courts may not issue an injunction or a writ of mandamus against the Congress. In order that there may be no interference with the business of the Congress, no Member of either House is subject to arrest, except for a criminal offense, during his attendance at a session of the House, or in going to or returning from it.[1] It is recognized that for similar reasons no Member of either House may be required to respond to a subpoena while the House is in session, as otherwise the quorum of the House may be broken. The established practice, the validity of which has never been successfully questioned, for a Member of Congress who is served with a subpoena to appear as a witness, is to secure permission of his House to respond to the summons. Such permission may be granted by a formal resolution. Similarly, the courts may not enjoin or restrain the President, or compel him by means of a mandatory injunction or a writ of mandamus, to perform some act. It is recognized that he may not be required to respond to a subpoena. In the early years of the Republic an attempt was made to subpoena Thomas Jefferson when he was President, to testify as a witness at the trial of Aaron Burr. Chief Justice Marshall, who presided at the trial ruled that the subpoena should issue, but expressed some doubts as to whether the President's attendance could be compelled. Jefferson took the position that he was not obliged to comply on the theory that it was not consonant with his office as President to do so, and the matter was dropped.[2]

It is no part of the judicial function to supervise or control the business of the executive or legislative departments of the Government. Otherwise the judiciary, instead of being one of three coordinate branches, would be supreme over the other two. We would then have a government by the courts, instead of by the Congress and the President. Manifestly the Founding Fathers did not contemplate such a result.

Chief Justice Taney remarked in Decatur v. Paulding, 14 Pet. 497, 516, 10 L.Ed. 559, that "The interference of the courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief; and we are quite satisfied, that such a power was never intended to be given to them." This comment is equally applicable to the business of the legislative branch.

It is a basic duty of the Federal courts zealously to maintain their independence and not to tolerate any encroachment upon it. By the same token, it is equally the obligation of the judiciary not to attempt to usurp or infringe on the powers or independence of either of the other two departments. The ringing words of Mr. Justice Stone, in United States v. Butler, 297 U.S. 1, 78–79, 56 S.Ct. 312, 325, 80 L.Ed. 477, although uttered in a dissenting opinion, have made a deep impress on jurisprudence. He eloquently observed that, "while unconstitutional exercise of power by the executive and legislative branches of the government is subject to judicial restraint, the only check upon our own exercise of power is our own sense of self-restraint. For the removal of unwise laws from the statute books appeal lies, not to the courts, but to the ballot and to the processes of democratic government."

The nature of the judicial process and the function of the courts consist of deciding actual cases and controversies. The sole jurisdiction and duty of the courts is to pass on the individual legal rights that parties to litigation assert and seek to have vindicated. For example, the authority to declare statutes unconstitutional is not a plenary power

---

1. Constitution, Art. I, Sec. 6.

2. United States v. Burr, 25 Fed.Cas. 30, No. 14,692d; Beveridge, Life of Marshall, Vol. 3, p. 454.

to strike down any legislative enactment as invalid. It is merely the function of determining what law governs the actual case or controversy before the court. If one party relies upon a statutory provision but the court concludes that the statute is repugnant to a clause of the Constitution, the Constitution takes priority as the supreme law of the land. The court must then decide the case in accordance with the Constitution and ignore the statute that is inconsistent with it, thereby, and only to that extent, leading to the conclusion that the statute is unconstitutional and therefore unenforceable. Chief Justice Marshall demonstrated this chain of reasoning with the precision of Aristotelian logic in Marbury v. Madison, 1 Cranch. 137, 2 L.Ed. 2d 60.

While, as has been indicated, no suit lies against the Congress or against the President, actions may be maintained against their subordinates, but only if an individual legal right is involved. Thus, heads of executive departments are subject to suit in the Federal courts, but only if the head of the department is acting contrary to the law that circumscribes his duties, or fails to carry out a Congressional mandate; and further provided the individual legal rights of the party who brings the suit, are violated by the officer's activity or failure to act.[3] Such a suit may not be maintained, however, in respect to a political matter or a matter that the law leaves to the officer's discretion.[4] Subject to the same limitations, actions lie against individual officers of the legislative branch of the Government, such as the Comptroller General,[5] and the Public Printer.[6]

In order that the plaintiff in the case at bar may maintain this action, it is essential for him to establish that the defendants have violated some personal right that the law accords to him. Whether any Government records are open for inspection by the public or some segment of the public is, in the first instance, to be determined by the Congress. This subject is within the legislative power. If the Congress legislates to the effect that certain specified records are to be open to the public, or to some specified members of the public, and a person to whom this right is extended by such an enactment, is denied access to the records by their custodian, then and only then, at the behest of such person, the courts may act and enforce the right of inspection that the Congress has given him. It is necessary, therefore, to examine and scrutinize the statutes bearing on this point, since the courts may not rule that the records in question are public and open to inspection unless the Congress first legislated to that effect.

The statutory provisions on this subject are found in Title 2 of the United States Code Annotated, which relates to the Congress. Section 102 requires the Secretary of the Senate and the Clerk of the House of Representatives to prepare and submit to the two Houses, respectively, at the commencement of each session of Congress, a statement showing the names of all persons who have been employed in their respective offices during the preceding year, and those of the messengers of the respective Houses; the time that each person was actually employed; and the sums paid to each. Second, the Secretary of the Senate and the Clerk of the House of Representatives are required to submit a detailed, itemized statement of expenditures out of the contingent fund for each House.

3. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153. The law reports are replete with actions against the Secretary of the Interior involving title to public lands; and against the Secretary of Agriculture in matters involving his regulatory activities, but such suits may be maintained only in respect to matters involving individual legal rights.

4. State of Mississippi v. Stanton, 154 U.S. 554, 14 S.Ct. 1209, 18 L.Ed. 725; State of Georgia v. Stanton, 6 Wall. 50, 18 L. Ed. 721.

5. E. g. Miguel v. McCarl, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901.

6. E. g. Duncan v. Blattenberger, D.C., 141 F.Supp. 513.

Section 103 imposes a duty on the Secretary of the Senate and the Clerk of the House to require disbursing officers acting under their direction or authority, to submit a return of precise and analytical statements and receipts for all moneys expended during the preceding year. The section further provides that the results of such returns and the sum total shall be communicated annually to Congress by the Secretary and the Clerk. It should be observed that under Section 103, the only documents to be submitted to the Congress by the Secretary and the Clerk, respectively, are the results of the returns made by the disbursing officers and the sums total.

Section 113 requires the Secretary of the Senate and the Clerk of the House to submit full and complete statements of their receipts and disbursements showing the items of their expenses in detail. There is no express provision and none can be perceived as a matter of necessary implication to the effect that all of these financial statements are to be termed public records in the sense of being accessible to public inspection. The conclusion is, therefore, irresistible that no statutory right is granted to the plaintiff, or to any other member of the public, to have access as a matter of course to the records that he seeks to inspect.

The plaintiff, however, does not base his claim solely on an alleged statutory right. He asserts that he has a Constitutional right to inspect the records in question. He predicates this contention on two grounds, each independent of the other. First, it is urged that the right to see the records in question is part of the Constitutional freedom of the press, since he desires to inspect them in his capacity as a representative of the press. Freedom of the press is,

of course, one of the basic elements of the Anglo-American concept of ordered liberty. It is considered of such vital importance that it is expressly protected by the First Amendment to the Constitution as against infraction by Federal law, and is safeguarded by the due process clause of the Fourteenth Amendment, as against interference or transgression by the States.[7] To discuss freedom of the press at length would be superfluous, for we have reached a stage in our development at which we take it for granted. It is no longer essential to vindicate and champion it as was valiantly and convincingly done by John Milton in his Areopagitica, in the 17th Century, when the idea seemed novel, dangerous and almost revolutionary. The Anglo-American world has progressed so that even as far back as a century ago, it was observed by John Stuart Mill in his celebrated essay on Liberty, that "the time, it is to be hoped, is gone by, when any defense would be necessary of the 'liberty of the press' (Chap. II). In the interest of clarity of thought, however, it is essential to define our terms and consequently the phrase, "freedom of the press" needs explanation and interpretation.

Freedom of the press comprehends a right to print and publish and to disseminate, circulate, and distribute matters that have been printed, without prior restraint, without license, without censorship, and without discriminatory taxation, but subject to the consequences of the law of libel and to the criminal penalties imposed by such laws, as those that ban obscenity, fraud, incitement to crime, espionage and the like, or that protect the needs of national defense and security.[8] The press is not liberated, however, from amenability to law generally. For example, newspaper pub-

7. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 500–501, 72 S.Ct. 777, 96 L.Ed. 1098; Grosjean v. American Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660; Near v. State of Minnesota, 283 U.S. 697, 707, 723, 51 S.Ct. 625, 75 L.Ed. 1257.

8. Associated Press v. National Labor Relations Board, 301 U.S. 103, 132–133, 57 S.Ct. 650, 81 L.Ed. 953; Grosjean v. American Press Co., 297 U.S. 233, 56 S. Ct. 444, 80 L.Ed. 660; Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357.

lishers and press associations are subject to the National Labor Relations Act, 29 U.S.C.A. § 151 et seq.,[9] the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.,[10] and the Antitrust laws, 15 U.S. C.A. § 1 et seq.[11] the liberty of the press does not include any legal right of securing assistance from public officials in procuring information that it is desired to print. It does not comprise any alleged right of access to material not available to others, any more than it would include the privilege of attending closed meetings at which news of interest might possibly be gathered.

It is a useful device for testing the cogency and soundness of an argument to endeavor to apply it to extreme suppositious cases and determine its possible effect on them. Thus, it would hardly be argued that the press, in exercising its Constitutional privilege, may insist on the admission of its representatives to meetings and conferences that are not open to the public, such as, for example, executive sessions of Congressional committees, meetings of the President's cabinet, conferences of judges in deciding cases that have been argued before them, as well as other similar groups. Similarly, it would hardly be urged that the press is entitled to access to written material that the law does not regard as being automatically open to public inspection, such as, for example, staff reports submitted to Congressional Committees, until the latter choose to release them; letters to the President from his advisers, unless he sees fit to make them public; memoranda written by personnel of executive departments to their superiors; or drafts of contemplated or tentative opinions of members of the judiciary until they take final form and are publicly handed down. Numerous other instances of a similar nature may be cited at length.

The conclusion is inevitable that the Constitutional privilege of freedom of the press does not include a right on the part of representatives of the press to inspect documents not open to members of the public generally.

■ The second basis on which the plaintiff urges that the defendants have invaded his Constitutional rights is that their refusal constitutes an interference with his right to pursue his occupation and, therefore, is a deprivation of a property right without due process of law. Manifestly, the defendants have done nothing to obstruct affirmatively the plaintiff's pursuit of his chosen calling. The most that can be said is that they have declined to aid him to see documents which Congress has not seen fit to make accessible to the public. Much that has been just said in regard to the Constitutional freedom of the press is equally applicable here. The conclusion is inescapable that there is no basis for the contention that there has been any unlawful interference with the plaintiff's Constitutional right to pursue his vocation.

In the light of the foregoing considerations the court is of the opinion that the plaintiff has no legal right to insist on seeing the records that he desires to inspect and that, consequently, the complaint does not state a claim on which relief may be granted.

Motion to dismiss the complaint is granted.

9. Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953.

10. Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607.

11. Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L. Ed. 1277; Lorain Journal Co. v. United States, 342 U.S. 143, 155, 72 S.Ct. 181, 96 L.Ed. 162; Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L. Ed. 2013; Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co., 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356.